FILED
United States Court of Appeals
Tenth Circuit

**March 18, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

CLIFFORD SMITH,

                Plaintiff - Appellant,

v.

CENTRAL MINE EQUIPMENT
COMPANY,

                Defendant - Appellee.

No. 12-6195
(D.C. No. 5:10-CV-00999-HE)
(W.D. Okla.)

---

## ORDER AND JUDGMENT[*]

---

Before **HARTZ**, **O'BRIEN**, and **TYMKOVICH**, Circuit Judges.

---

No one knows how it happened, but on the morning of February 10, 2010, Cliff
Smith found himself entwined in the auger of a truck-mounted drill rig. The accident
caused severe disabling injuries, including the loss of his right arm and leg. He brought
an action against the manufacturer of the rig, Central Mine Equipment Company (CME).

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. P. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished). *Id.*

His complaint alleged strict product liability and negligent design. He appeals from a summary judgment in favor of CME on his strict liability claim and alleges trial errors led to a jury verdict absolving CME's negligence. We affirm.

## BACKGROUND

A.    <u>The Drill</u>

CME designed and manufactured the offending equipment, a CME-55 truck-mounted auger drill, (the Drill) in 1981 and first sold it in 1982. In 1989, it was returned as a trade-in and remained in CME's fleet until 1992. While at its facilities, CME placed a "wobble-switch system" on it. This system consisted of sensor rods attached to switches. The sensor rods hung down on both sides of the Drill mechanism and were positioned so that a person would touch the sensor rod before coming into contact with the auger. Touching the sensor rod would open the switch, shut the unit down, and stop the auger from turning. The Drill also had emergency switches on both the operator's side and the helper's side of the Drill. When these switches were pressed, the Drill would shut down. At the time CME sold the Drill to a Texas company in 1992, the wobble-switch system and the emergency shut-down buttons were operational.

The Drill was sold to at least one other company before Smith's employer, Burgess Engineering and Testing Company (Burgess), purchased it in 1999. When Burgess bought the Drill, the wobble-switch system and the emergency switches were no longer operable. In 2000, Burgess sent the Drill to CME for the limited purpose of adding an "automatic hammer." In November 2000, CME's quality control manager

prepared an inspection report on the Drill and noted the wobble switches were gone. Burgess's owner was advised of the problem but declined to have them replaced.

B.     Smith

Smith began part-time work with Burgess in 2002 as a driver and mechanic. At that time, Burgess had two CME drill rigs—the Drill and a track mounted CME-45. Smith was employed full-time in late 2004/early 2005. By that time, Burgess had also acquired a used 1998 CME-75 and had ordered a new (2004 model) CME-55 (New Drill). The 1998 CME-75 rig had wobble switches. When Smith went to CME to take possession of the New Drill for Burgess, CME instructed him on its operation, including instruction on the wobble-switch system.

From 2005 until the day of the accident, Smith was the head drill operator; as such, he was responsible for the maintenance of Burgess's four CME drill rigs. He considered himself an experienced driller/rig operator. At some point prior to the accident, Smith replaced one of the wobble switches on one of the other drills.

From 2005 through 2010, Smith operated the Drill over a hundred times. He understood that all of the drills were dangerous pieces of equipment. He knew he should not get close to the auger; it was an open and obvious danger.[1] Smith acknowledged that wobble switches should be on every drill rig because they make the rig much safer.

---

[1] Smith also knew the operator's platform on the Drill had been bent at an angle and had not been repaired.

- 3 -

Despite his knowledge that the Drill lacked operational safety equipment, making it more dangerous than it would be otherwise, he used it almost every day.

Smith does not know how he got caught in the auger and has no memory of what happened. The last thing he remembered was having drilled to five feet and his helper, Derek Counts, had taken a soil sample to the side of the truck for testing. Smith's next memory was calling his boss to tell him he would not be able to finish the job that day.

## PROCEDURAL BACKGROUND

A.    <u>Summary Judgment – Strict Liability</u>

Smith claimed CME was strictly liable because it had placed a defective product, the Drill, in the marketplace. He also claimed CME negligently designed the Drill. Both claims were based on the lack of a guard around the auger and CME's failure to design the clutch lever with a "deadman switch" to cut the power if the operator's hand released the lever. Both parties moved for summary judgment. Relevant here, the district judge entered summary judgment in favor of CME on the strict product liability claim. He concluded Smith could not show the rig was unreasonably dangerous beyond the expectations of a foreseeable user. By doing so, it was unnecessary to decide CME's argument regarding assumption of risk. He denied CME's summary judgment motion on Smith's negligence claim because there was a question of fact as to whether CME used due care in designing the drill rig. In summary, the only issue submitted to the jury was negligent design.

B.     Pre-Trial Evidentiary Rulings – Negligent Design

Prior to the negligent design trial, the judge granted, in part, CME's motion to exclude two sources of evidence. First, he excluded some testimony proposed by Smith's expert, William Munsell. Munsell was prepared to testify CME's design was negligent because CME did not incorporate a deadman switch and, in 1982, CME had the technology and ability to place one on the Drill at a reasonable cost. Munsell had developed a deadman switch which he planned to demonstrate at trial. CME sought to have Munsell's proposed testimony excluded because, in its view, he was not a qualified expert, his opinions were not supported by sound scientific methodology, and his alternative design had never been tested on a truck-mounted rig in the field. The judge denied CME's motion, but limited Munsell to stating his design worked in the lab; Munsell would not be permitted to testify that his design would work in the field.

The judge also excluded evidence of events occurring after 1992, the date CME last had control of the Drill. He determined any later events were not relevant to CME's liability for negligent design. Smith protested because the limitation prevented him from examining witnesses about a 2008 accident involving a CME drill. At that time, a Canadian rig operator was killed when he fell into an auger attached to a CME drill. Following the accident, Dan Carrocci, the operator's employer, designed, built, and used a barrier guard on his three CME rigs. In 2009, Carrocci brought his design to CME and repeatedly tried to convince CME's president, David Neibert, to try the guard and consider incorporating it into CME's design. Neibert declined. In addition, Smith said the evidence of the 2008 accident would impeach CME's corporate witness who had

- 5 -

failed to report the incident in his discovery response, even though he had testified at the Canadian investigation into the matter.

C.     Jury Instruction on Assumption of Risk

At the end of the trial, the judge instructed the jury on assumption of risk. Smith contended the instruction was unsupported by the evidence because he had not consented to any contact with the auger or to his subsequent harm. According to Smith, the instruction misled the jury and allowed CME to assert an unwarranted and complete defense to his claim.

D.     Judgment as a Matter of Law – Punitive Damages

At the close of Smith's evidence, the judge granted CME's motion for judgment as a matter of law on his request for punitive damages. *See* Fed. R. Civ. P. 50.

The jury returned a verdict for CME on the only issued submitted to it−negligent design. Smith challenges the summary judgment ruling, the pretrial rulings, the instruction on assumption of the risk, and the refusal to submit the punitive damages issue to the jury.

## DISCUSSION

A.     Alleged Trial Errors

1.     Assumption of Risk Instruction – Negligence

Smith contends the jury was misled when it was instructed on assumption of the risk as a defense to his negligent design claim. According to Smith, CME had to submit evidence of his consent to be harmed before CME was entitled to an instruction providing

a complete defense.[2]  "State law governs the substance of a jury instruction in a diversity case, and federal procedure governs the grant or denial thereof."  *Holt v. John Deere & Co., Inc.*, 24 F.3d 1289, 1292 (10th Cir. 1994).

The Oklahoma Supreme Court has said, "[t]he touchstone" of the assumption of risk defense in a negligence action is "consent to harm and not heedlessness or indifference."  *Thomas v. Holliday*, 764 P.2d 165, 169 (Okla. 1988).  As *Thomas* elaborated:

> What is in actuality lack of due care or heedlessness on the part of a plaintiff is often mislabeled assumption of risk.  For risk assumption to avail as a defense to a tort claim for negligence there must either be an express agreement, a pre-existing status between the defendant and plaintiff, or an element of consent to the harm that is known and appreciated by the plaintiff.

*Id.* at 171.

Oklahoma recognizes three situations in which assumption of risk is a complete defense to a negligence claim.  The first, primary assumption of the risk (a direct consent to assume risk), and the second (implied primary assumption of the risk, such as attendance at a sports event) are not at issue here.  *See Thomas*, 764 P.2d at 168, 169 n.8. The third, however, is "called *implied secondary assumption of risk, . . .* [where] the plaintiff *implicitly assumes the risk* created by the plaintiff's negligence."  *Id.*  "Even

---

[2] Smith does not challenge the wording of the instruction.  The jury was informed CME must prove Smith (1) "knew of the risk and appreciated the degree of danger;" (2) he "had the opportunity to avoid the risk;" (3) he "voluntarily exposed himself to the danger;" and (4) his "action was the direct cause of his injury."  (Appellant's App'x Vol. 4 at 1864.)

though the defendant in such cases is found to be at fault, the plaintiff is barred from recovery on the ground that he knew of the unreasonable risk created by the defendant's conduct and voluntarily chose to encounter that risk." *Id.* As the Oklahoma court explained, "[t]his concept is encapsulated in the maxim *volenti non fit injuria,* which means: If one, knowing and comprehending the danger, voluntarily exposes himself to it, though not negligent in so doing, he is deemed to have assumed the risk and is precluded from recovery for the resulting injury." *Id.* at 169. We apply a subjective standard, rather than the objective "reasonable man" standard applied in negligence cases because the defense is predicated upon the plaintiff's "knowledge and appreciation of the danger and voluntary assent." *Id.*; *see also Palmer v. Krueger*, 897 F.2d 1529,1534 (10th Cir. 1990) ("[K]nowledge of the danger is an essential of the defense of assumption of risk, and the doctrine does not apply unless the one alleged to have assumed the risk can be found to have known or to have been charged with knowledge of the danger."). We determine subjective intent by examining the information available to the plaintiff at the time of the injury; we do not consider post hoc rationalizations. *See Thomas*, 764 P.2d at 169 n.13, 171 n.19.

Smith argues, "while . . . he was aware that the drill rig posed a danger, there is no evidence whatsoever that he consented to being injured, and CME did not even contend that there was such evidence." (Appellant's Br. 27.) According to Smith, CME was required to show he voluntarily came in contact with the auger to establish Smith's assumption of the risk.

CME claims our decision in *Slane v. Jerry Scott Drilling Co.*, 918 F.2d 123 (10th Cir. 1990), is dispositive. We agree. In *Slane*, we approved an assumption-of-risk-instruction in a factual situation similar to Smith's. Richard Slane was seriously injured when, in the course of doing a "drill stem test by pulling wet," the oil and gas in the well exploded. *Id.* at 124. Applying the *Thomas* and *Palmer* standard, we said: "[Slane] was imminently aware of the inherent dangers in and about the oil field and uniquely aware of the dangers of a drill stem test. As such, once he voluntarily went to . . . perform the drill stem test, he was deemed to have assumed the risk and is precluded from recovery for the resulting injury." *Id.* at 127 (quoting *Thomas*, 764 P.2d at 169).

> It was uncontested that [Slane] had over thirty years [of] experience in oil field work and was considered to be a very good tester. [He] personally testified that: he was the supervisor for the drill stem test; he had pulled some 300 wet drill stem tests; he knew it was dangerous to pull wet; he considered the oil field, at its best, to be somewhat dangerous and, at its worst, to be deadly; when on a rig he was in charge of his own safety; and experienced men always watch out for themselves first and one other man.

*Id.*

Here, analogous facts were established at Smith's trial. Smith testified to having previously injured his arm in a rotating device on another piece of equipment; he knew, first-hand, the danger of getting near a rotating device. More importantly, he had been the rig supervisor for more than five years; he supervised four drill rigs and crews; he was in charge of maintenance and could order safety devices; he had operated all the drilling rigs; he was very experienced with the Drill; he knew the controls; he knew the shut-down devices were not operable; he had been given a demonstration of the wobble

- 9 -

switches as well as all the other features on the rig; he told his employer he thought the rig was unsafe and talked about getting wobble switches; he knew there was no device that would stop the rig if he turned loose of the controls; he knew there was no guard; and he knew the operator's platform was not level.  In spite of the increased danger caused by these conditions, he chose to use the rig.

Contrary to Smith's assertion, his situation is unlike the plaintiffs in *Thomas* and *Palmer*, where the assumption of risk instruction was rejected based on the lack of evidence.  In *Thomas*, a security guard opened the door of a shoplifter's car and put his body partially inside in an attempt to foil the thief's escape.  Thomas was injured when he fell out as Holliday turned the car to make his getaway.  764 P.2d at 166.  Essentially, the court determined the defendant had only shown contributory negligence because there was no evidence the plaintiff had assumed the risk that the defendant would continue to drive in a manner causing injury to the guard.  *Id.* at 170 ("A plaintiff may expose himself to potential harm and not consent to relieve the defendant of any *future* duty to act with reasonable care.") (emphasis added).

In *Palmer*, a passenger was killed in a plane crash, cause unknown.  897 F.2d at 1531-32.  Because there was no evidence from the record that the passenger "consented to harm or was aware of any particular danger," we held it was error to give an assumption of the risk instruction to the jury.  *Id.* at 1534.  The passenger's ownership interest in the plane and a general knowledge that planes can be dangerous was not sufficient to warrant an assumption-of-risk instruction.  *Id.*

In neither instance were the plaintiffs aware of the particular risk they confronted. In *Thomas,* the court said Thomas's general understanding of an inchoate risk justified a contributory negligence instruction but not one on assumptions of risk. Here, Smith was intimately familiar with specific, identified risks and chose to operate the rig in spite of them. No evidence suggests he was under some compulsion to do so; he was the person charged with keeping the rigs operational. Moreover, the risk he assumed was not the myriad conditions drilling operators may face, but the risk of negligent design. Assuming negligent design (a hotly contested matter), Smith, because of his experience and expertise, knew specifically what those claimed design deficiencies were—no auger guard and no deadman switch. He appreciated a very specific and identifiable risk and chose to operate the Drill in spite of the risk. He assumed the risk.

The fault with Smith's argument is that he seizes a few words or phrases in an opinion but misapprehends the operative concept. The relevant consent is to fully appreciate the danger; no rational person would <u>consent</u> to being injured. "Consent" means appreciating and accepting a specific risk of harm. Smith's continued use of the Drill in a condition he acknowledged was more dangerous than if the safety devices had been operational, and his ability to prevent this situation, established his consent to be exposed to the very danger he claims caused his injuries. The judge did not err in instructing the jury on assumption of risk.

2.     Admission of Evidence

Smith claims the judge abused his discretion when he refused to allow Munsell to testify his deadman's clutch would work on a truck-mounted rig in the field. Smith also

claims the judge erred in limiting the witnesses' testimony to events occurring before

CME sold the Drill as used equipment in 1992.

*Expert Testimony*

The judge limited Munsell's testimony because his device had not been tested on

any truck-mounted rig nor did Munsell have any personal experience with the operation

of a truck-mounted drilling rig.  In response, Smith argues:

> Allowing Munsell to testify about the switch and that it would work in and
> of itself is entirely inconsistent with refusing to allow him to testify that it
> would work on the rig.  Plaintiff did not have a CME drill rig available
> upon which to install Munsell's switch, and did not have the $100,000.00 to
> purchase one for purposes of such a test.  The trial court clearly abused its
> discretion in refusing to allow Munsell to give this testimony.

(Appellant's Br. 29.)

The trial judge performs an important gatekeeping role in assessing scientific

evidence.  *Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1204 (10th Cir. 2002); see

*Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993).  The judge "must determine

at the outset, pursuant to [Fed. R. Evid.] 104(a), whether the expert is proposing to testify

to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine

a fact in issue."  *Hollander* 289 F.3d at 1203-04 (quoting *Daubert,* 509 U.S. at 592).  We

review such a determination for an abuse of discretion and "afford *substantial deference*

to the district court . . . ."  *Id.* at 1204.  There is nothing in this record which would

support the notion that Munsell had sufficient experience (he had none) to opine on how

the device he created for this litigation would perform as a part of the rig's operation in

the field.  There was no abuse of discretion.

- 12 -

*Temporal Limitation on Testimony*

As Smith acknowledges, "Oklahoma does not recognize a post-sale duty to warn or retrofit a product." *Wicker ex rel. Estate of Wicker v. Ford Motor Co.*, 393 F. Supp. 2d 1229, 1236 (W.D. Okla. 2005); *Kirkland v. Gen. Motors Corp.,* 521 P.2d 1353, 1366 (Okla. 1974); *see also Romero v. Int'l Harvester Co.*, 979 F.2d 1444, 1446, 1451 (10th Cir. 1992) (under similar Colorado law, a manufacturer has no duty to notify previous purchasers of its products about later-developed safety devices, or to retrofit those products when the products were non-defective under standards existing at the time of manufacture—collecting consistent cases). Undaunted, Smith argues, because "CME took upon itself the duty to retrofit or otherwise modify for safety purposes its products that came back under its control after initial manufacture and sale. . . . it was required to undertake such activities in a non-negligent manner, using reasonable care under the circumstances." (Appellant's Br. 32.) True enough, but he further maintains CME's assumption of this duty made it "liable for negligence related to its failure to use ordinary care with respect to the [Drill] at any time – whether in 1982, 1992, 2000, 2008, or the day before the Plaintiff's accident."[3] (Appellant's Br. 31.)

---

[3] As best we can understand, Smith's argument relates to events which occurred after 1992. For some reason, he claims CME's voluntary addition of the wobble switch system required CME (once it knew of Carrocci's proposed auger guard, any accidents involving CME equipment or any industry safety improvements) to determine whether it needed to redesign and retrofit the devices it had sold. The authority he cites does not support this argument.

Smith primarily relies on *Fry Land & Cattle Co. v. Colorado Interstate Gas Co.*, 805 P.2d 695, (Okla. Civ. App. 1990).[4]  There, Fry placed some panels in a fence line to keep his cattle from escaping from his pasture into CIG's metering facility and beyond.  Although Fry's panels were able to contain his animals, they interfered with CIG's operations.  CIG removed the panels, tore down the remaining fence, and replaced it with a new one.  CIG's fence was not strong enough to contain the animals.  Since CIG had volunteered to replace the fence, the court said:

> [W]hen a person has no duty to act with regard to a matter, if he volunteers

---

[4] Smith also cites *Bell Helicopter Co. v. Bradshaw*, 594 S.W.2d 519 (Tex. Civ. App. 1979).  In that case, Bell was sued for strict liability and negligence after one of its helicopters, rented by the plaintiffs to survey ranch land, crashed and severely injured the plaintiffs.  *Id.* at 526, 531.  At one point in time prior to the crash, Bell learned its "102 tail rotor blade . . . had a history of in-flight fatigue fracture failures."  *Id.* at 526.  This caused Bell to design an improved blade, which it placed on its helicopters manufactured in 1970 and thereafter.  *Id.* at 527.  Significantly, the helicopter was owned by one of Bell's authorized service stations between 1969 and 1973.  *Id.* at 530-31.  The court determined Bell had a duty, under an "undertaking" theory, to "either mandat[e] replacement through authorized service stations or recommending, in language reasonably calculated to impress upon users the gravity of the risk, that such replacement be made."  *Id.* at 532.

There are several reasons why this holding is not persuasive in this case.  First, as the *Bell* court recognized, "Ordinarily, proof of post-accident efforts by a defendant to remedy or improve the situation which contributed to the accident is not admissible or relevant to the issue of negligence."  *Id.*  But because Bell did not object to this evidence, it was properly before the jury.  Here, CME's objection specifically placed the relevant time frame at issue prior to trial.

Second, the Drill's alleged defect was not unknown to Smith as was the defect in *Bell*.  Finally, the holding in *Bell* has been largely criticized and specifically disapproved by the Texas Supreme Court.  *See Torrington v. Stuzman*, 46 S.W.3d 829, 838 n.7 (Tex. 2000); *Romero*, 979 F.2d at 1451 n.6.

to assume that duty, either expressly or by his conduct, he must exercise
ordinary care and is liable for injury resulting from his failure to do so.  By
removing the fence which Fry had repaired . . . and replacing it with
another, CIG assumed the duty of acting reasonably to insure its actions did
not cause injury to Fry or others.

*Id.* at 696-97.

Under *Fry,* CME clearly had a duty in 1992 to install its safety devices in a non-
negligent manner.   *Fry* does not, however, establish a duty to do more in the future.  The
judge properly determined events occurring after the manufacture in 1981 through 1992
were relevant, but not later ones.  The only time CME had the Drill after 1992 was when
it was returned in 2001 for a specific purpose – to install an automatic hammer– and
Smith does not claim that work was negligently done.  Smith does not argue he was
limited in any way from bringing evidence of injuries prior to CME's last control of the
Drill.[5]  Moreover, even if the court would have allowed testimony up to the 2001
installation, the events Smith wanted to introduce occurred much later.  There was no
abuse of discretion in limiting the evidence to events occurring through 1992.

B.    Products Liability - Summary Judgment

We apply the same standard as the district court and review a grant of summary
judgment de novo.  *Oldenkamp v. United Am. Ins. Co.,* 619 F.3d 1243, 1246 (10th Cir.

---

[5] Because we find no error leading to the jury's verdict for CME, Smith's issues
relating to punitive damages are moot.  *See Aubertin v. Bd. of Cnty. Comm'rs of Woodson
Cnty, Kan.*, 588 F.2d 781, 786 (10th Cir. 1978).

2010).  Oklahoma's substantive law applies to this diversity action.  *See Ahrens v. Ford Motor Co.,* 340 F.3d 1142, 1145 (10th Cir. 2003).

In Oklahoma, there are three elements to a products liability claim:  the defect must have (1) caused the injury in question, (2) existed at the time it left the manufacturer's control, and (3) made the product unreasonably dangerous.  *Kirkland,* 521 P.2d at 1363 (adopting § 402A of the Restatement (Second) of Torts).  A product is unreasonably dangerous if it poses a danger "beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."  *Woods v. Fruehauf Trailer Corp.,* 765 P.2d 770, 774 (Okla. 1988).  Because the record did not establish "the CME-55 posed a danger beyond that which an ordinary drill operator would anticipate," the judge granted CME's motion for summary judgment.  (Appellant's App'x Vol. 3 at 1251.)

Smith argues the court unfairly considered this element because it was not raised or argued as a basis for summary judgment in CME's motion and briefs.  He is correct; CME did not make the argument.  He is also correct that his expert, Munsell, opined that the Drill was unreasonably dangerous.  However, Munsell did not state it was more dangerous than the ordinary consumer would perceive.  Rather, he said the Drill was unreasonably dangerous because, in his opinion, it was not designed in accordance with safe product design standards.  It did not have "appropriate operator controls," among other things, a "dead man switch" which would automatically stop the Drill when the operator's hand left the control.  (Appellant's App'x, Vol. 2 at 894.)  As the judge noted,

"that a product could have been designed to be safer, without more, does not establish that the product is unreasonably dangerous under Oklahoma's consumer-expectations test."  (Appellant's App'x Vol. 3 at 1251.)

Smith argues the judge's reliance on *Woods* was misplaced.  First, *Woods* was decided after a trial, not on summary judgment.  According to Smith, he was denied the chance to fully argue the point.  He claims CME's evidence established only that he was generally aware the Drill was dangerous:  there was no undisputed evidence the Drill was not more dangerous than Smith contemplated.

Smith should have been given an opportunity to directly address the dispositive issue before the judge entered summary judgment.  That said, we cannot find fault with the judge's conclusion.  The evidence in this case and the standard applied by the court is almost identical to the situation in *Woods*.

Woods was an experienced gasoline tanker driver for two years.  *Woods*, 765 P.2d at 774.  While filling a tank, the gasoline overflowed, the gas ignited, and Woods was severely burned.  *Id.* at 772.  Woods sued, among others, the manufacturer of the tanker truck.  He claimed the tanker trailer was unsafe for the purpose of hauling and unloading gasoline into above ground facilities because it could have been equipped with an automatic shutoff nozzle similar to the type employed in ordinary use for filling gasoline tanks on automobiles.  *Id.* at 774.  The evidence also showed that nozzles existed which could be modified for use at the high flow rates necessary for handling gasoline in large volumes.  *Id.*

On appeal, viewing the evidence in the light most favorable to Woods, the Oklahoma Supreme Court held that a directed verdict should have been entered for the tanker truck manufacturer.  Applying the consumer-expectations test, the court noted Woods was a foreseeable user and his use of the tanker was a foreseeable use.  His experience and training demonstrated he knew how to safely use the equipment.  The evidence showed the tanker trailer could be used safely as equipped, and the existence of a safer design did not make the product more dangerous than what would be contemplated by the foreseeable user.  Consequently, the tanker truck was not "less safe than would be expected by the ordinary consumer."  *Id.* at 775.

The facts here are very similar.  The record on summary judgment demonstrated Smith was a foreseeable user operating the Drill in a foreseeable way.  He was a trained and experienced drill operator and had safely operated the Drill for years.  He had reviewed the safety guides and the manuals and knew the drill was not in the same condition in which it had left the factory in 1992.  He also knew the auger did not have a guard and the rig lacked a deadman switch, thus allowing the auger to continue rotating when he removed his hand from the controls.  He testified that, in his experience, no drill rigs had guards.  He acknowledged he knew the rig was dangerous in general, the auger, in particular, was dangerous, and the Drill was more dangerous than others because prior owners had removed or disabled safety devices.  He admitted the Drill was working as it always did on the day of his accident.  There was no evidence the Drill was less safe than an ordinary consumer would expect.

Nevertheless, as Smith points out; the obviousness of the danger does not foreclose the possibility of the Drill being more dangerous than would be expected by a foreseeable user when it cannot be safely used. We encountered this situation in *Davis v. Fox River Tractor Co.* There, the plaintiff slipped from a dump truck attached to a forage blower and his foot slipped through a grid and into the hopper. 518 F.2d 481, 485-86 (10th Cir. 1975). Although it was obvious the hopper's grids were large enough to allow a person's feet to slip into contact with the augers, defendant's engineer finally conceded "the agricultural equipment standard required it to design a shield for the hopper if it were possible, whereby it could still function." *Id.* at 484. Because the plaintiff had shown a smaller grid could have been designed at a reasonable cost, we determined the district court did not err in denying the defendant a directed verdict even though the danger was obvious. We said:

> If a device is dangerous to life and limb *to the degree that no amount of care on the part of the user can overcome the defect* so as to prevent injury, the obviousness does not alleviate the danger. We have difficulty seeing how the knowledge of the dangerousness can alleviate the dangerous condition inasmuch as the performance by plaintiff of his assigned tasks subjected him to injury regardless of the care exercised.

*Id.* at 484-85 (emphasis added).[6] Thus, in the rare case in which a plaintiff demonstrates it was impossible to perform his assigned task without injuring himself, no matter what

---

[6] Our decision in *Davis* appears to retreat from the consumer expectations test found in the Restatement (Second) of Torts. In *Braswell v. Cincinnati Inc.*, 731 F.3d 1081, 1088 (10th Cir. 2013) we recently discussed the criticism of the consumer expectation test and the change in the Third Restatement of Torts, released in 1998, which "explicitly jettisoned the consumer expectations test and adopted the risk-utility

(Continued . . . )

care was taken by the plaintiff, the jury may consider whether, at the time of design, the danger could be effectively alleviated at an economically feasible cost. *See Castillo v. Am. Laundry Mach. Inc.*, 74 F.3d 1248, 1996 WL 1182, at *3 n.4 (10th Cir. 1996) (unpublished). Here, Smith did not demonstrate, or even allege, it was impossible to operate the Drill without subjecting himself to injury. The Drill had been in operation since 1982 without injury and Smith had operated it safely on a daily basis for over five years. *Davis* is inapposite.

Moreover, on appeal, Smith was aware of the basis for the judge's decision and has failed in his briefs and argument here to point to available evidence or argument which would undermine the judge's conclusion. And, even if Smith's lost opportunity to present argument were sufficient to prevail, another basis for granting summary judgment−assumption of risk−was argued to the district court. *See Richison v. Ernest Group, Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011) ("We have long said that we may affirm on any basis supported by the record, even if it requires ruling on arguments not

---

test," "under which manufacturers had a duty to eliminate dangers where an alternative design could do so without imposing unreasonable costs or impairing the functionality of the product." *Id.*; *see* Restatement (Third) of Torts: Products Liability § 2 cmt. G (1998) (noting that "consumer expectations do not play a determinative role in determining defectiveness" as "[they], standing alone, do not take into account whether the proposed alternative design could be implemented at reasonable cost, or whether an alternative design would provide greater overall safety"). As we noted in *Braswell*, however, "there is no sign that Oklahoma has backed away from the consumer expectations test since the release of the Third Restatement in 1998." *Id.* at 1089. And we acknowledge, in the thirty-eight years since *Davis* was decided, the Oklahoma courts have never cited, let alone adopted, its reasoning.

reached by the district court or even presented to us on appeal.").  We briefly discuss it now.

"[A]ssumption of risk . . . retains its place in product liability suits by workers against third-party manufacturers of harm-dealing products used in the workplace." *Thomas*, 764 P.2d 165, 167 n.5.  It is much like the *volenti non fit injuria* assumption of risk in a negligence case discussed in *Thomas*.  "The proper verbalization of this manufacturer's defense is *voluntary assumption of or exposure to the risk of a known defect." Id.*  The defendant must show the plaintiff had a "subjective awareness of the defect and consequent risk of injury."  *McMurray v. Deere & Co.*, 858 F.2d 1436, 1440 (10th Cir. 1988).  The uncontested facts, established through Smith's deposition testimony and reiterated at trial, show he knew the auger was dangerous and could cause injury or death, he knew it had no guard, he knew there was no deadman switch, he knew the operator's platform was bent, and he knew the safety devices CME had provided (wobble switch and emergency shutdown switches) were either not present or not operational.  Moreover, Smith was authorized and expected to maintain the Drill (and all the equipment) in safe condition, yet he continued to operate the Drill without repairing the obvious deficiencies for five years.  These uncontested facts demonstrate Smith's subjective knowledge of the defect and consequent risk of injury.  Smith chose to roll the dice.

AFFIRMED.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge